IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re: )<br>MIN SIK KANG AND MAN SUN KANG, )<br>    Debtors. )<br>_____ )<br>    )<br>YEON K. HAN, )<br>    Appellant, )<br>    )<br>v. )<br>    )<br>RAYMOND A. YANCEY, )<br>Chapter 11 Trustee, )<br>    Appellee. )<br>    )<br>    )<br>    ) | 1:15-CV-00953 (LMB/IDD)<br><br>On Appeal from<br>BK NO. 10-18839-RGM<br>in the United States<br>Bankruptcy Court for the<br>Eastern District of Virginia |

## MEMORANDUM OPINION

Appellant Yeon K. Han ("appellant" or "Han") challenges the bankruptcy court's order granting summary judgment on Count VII of the Appellee's Second Amended Complaint, which sought a declaratory judgment invalidating the transfer of ownership interest in Grand Centreville, LLC ("Grand Centreville") to Han.[1] Specifically, the bankruptcy court found that the purported sale of a 60% interest in Grand Centreville was and remains ineffective, null, and void, and that, as a result, Grand Equity, LLC retained its 99.5% ownership interest in Grand Centreville. Further, the court held that the Debtors' bankruptcy estates remain the owners of 100% of the interests in Grand Formation, Inc. For the reasons that follow, the bankruptcy court's decision will be affirmed.

I.   BACKGROUND

---

[1] The grant of summary judgment on Count VII had the effect of mooting Counts I and II of the Appellee's Second Amended Complaint.

### A. Grand Centreville

Grand Centreville was organized as a limited liability company in February 2004 for the purpose of acquiring, developing, and managing a retail shopping center in Centreville, Virginia. Appellee's Br. at 4. Shortly thereafter, Grand Centreville obtained a loan of approximately $19.5 million from CapitalSource Finance, LLC to acquire property. Id. Grand Equity, LLC ("Grand Equity"), a shell, was the sole member of Grand Centreville at the time of its organization. Id. at 5. Grand Equity was organized for the sole purpose of owning and managing Grand Centreville. Id. Grand Equity's managing and sole member was Grand Development, LLC ("Grand Development"), which was wholly owned and managed by the Debtors, Min and Mik Kang. Appellant's Br. at 3. Like Grand Equity, Grand Development was a pass-through entity formed solely to own and manage Grand Equity. Appellee's Br. at 5. Upon Grand Centreville's organization in 2004, the Debtors, through Grand Equity, established an Operating Agreement dated March 17, 2004 ("2004 Operating Agreement"). Id. at 6. Ronnie C. Kim's name is handwritten into a blank space as the "Independent Member," and the signature page bears a signature that states his name along with "by Jae Kim." See 2004 Operating Agreement. Ronnie Kim testified at trial that he had nothing to do with Grand Centreville, had never seen the 2004 Operating Agreement before his deposition, and did not direct Jae Kim to sign on his behalf. Summ. J. Hr'g Tr. 19: 23-25; 21:5-10; 21:22-24; 22:6-8 [Dkt. No. 289], Oct. 17, 2014.

In June 2005, Grand Centreville refinanced its existing loan using a loan of approximately $27 million from CIBC, Inc. Id. at 6. That transaction required Grand Centreville to execute a "Deed of Trust, Assignment of Leases and Rents and Security Agreement" ("2005 Deed of Trust"), which prohibited a number of transactions that might threaten the lender's interests including: (i) transferring more than a 49% ownership interest in Grand Centreville, see 2005 Deed of Trust § 1.11(c)-(d); (ii) Grand Centreville incurring debts outside the ordinary

2

course of business, see id. § 1.27(e); and (iii) Grand Centreville encumbering the property with additional security interests. See id. The lender reserved the right to waive any of these prohibitions by consenting to a transaction. See, e.g., id.

In the course of refinancing Grand Centreville's original loan, the Debtors incorporated Grand Formation, Inc. ("Grand Formation"). Appellee's Br. at 7. Grand Formation became Grand Centreville's managing member and acquired a 0.5% ownership interest—leaving Grand Equity with a 99.5% ownership interest. Appellant's Br. at 3. Like Grand Equity, ownership of Grand Formation was in the hands of the Kangs alone. Appellee's Br. at 7. Grand Equity and Grand Formation, in connection with the refinancing, created the "Amended & Restated Operating Agreement of Grand Centreville, LLC" ("2005 Operating Agreement"). Id. at 8. The 2005 Operating Agreement contains provisions that mirror the restrictions in the 2005 Deed of Trust. See 2005 Operating Agreement Art. 18.

The 2005 Operating Agreement, like the earlier version, lists Ronnie C. Kim as the "Independent Member," Id. at 1; however, his signature is absent from the "Confirmation of Operating Agreement" signature page that also lists him as the Independent Member. Id. at 12. Kim testified that he had never signed the 2005 Operating Agreement and had not seen it before his deposition in this case. Summ. J. Hr'g Tr. 23:2-8 [Dkt. No. 289], Oct. 17, 2014. Although the penultimate page of the 2005 Operating Agreement is signed by Mr. Kang on behalf of Grand Formation, the final page entitled "Confirmation of Operating Agreement"—where Mr. Kang purportedly signed on behalf of Grand Equity—incorrectly references the 2004 Operating Agreement and is dated before the establishment of the 2005 Operating Agreement. Appellee's Br. at 18.

As of December 31, 2008, the State Corporation Commission of Virginia cancelled both

Grand Equity and Grand Development due to nonpayment of annual registration fees. Id. at 9. Appellee contends, and the Appellant does not appear to dispute, that Virginia law dictates that upon automatic cancellation of a limited liability company, its "properties and affairs . . . shall pass automatically to its managers, or if the limited liability company is managed by its members, then to its members, or if the limited liability company has no managers or members, then to the holders of its interests, in each such case as trustees in liquidation." Va. Code Ann. § 13.1-1050.2(C). Because Grand Equity was wholly owned by Grand Development, and Grand Development was wholly owned by the Debtors, Appellee asserts that by operation of the Virginia statute the Kangs held a 99.5% equitable or beneficial interest in Grand Centreville. Appellee's Br. at 9, 59 ("It is undisputed that Grand Equity and Grand Development were shell, pass-through entities that had no creditors or obligations to third parties."); see also Va. Code Ann. § 13.1-1050.2(C) ("After paying or adequately providing for the payment of all its obligations, the trustees shall distribute the remainder of its assets, either in cash or in kind, among its members or interest holders according to their respective rights and interests.").

On March 16, 2009, the purported sale that is the subject of this litigation took place. The Kangs entered into an agreement to sell 60% of their interests in Grand Centreville and Grand Formation to Appellant and James Sohn ("Sohn").[2] Appellee's Br. at 10; Appellant's Br. at 3. The terms of this sale are set down in the "Sale of Membership and Stock Interest Agreement" ("Sale Agreement"). Han obtained a 9% interest and Sohn obtained a 51% interest. Appellee's Br. at 10. Sohn and Han also received a $3.85 million promissory note in their favor, which was secured by a security interest in Grand Centreville's property ("2009 Han/Sohn Note"). Id. In addition, Grand Equity, Grand Formation, Han, and Sohn executed an amended operating

---

[2] Sohn is not a party to this appeal because he settled with the Appellee after the bankruptcy court ruled on summary judgment. See Appellee's Br. at 3, n.2.

4

agreement for Grand Centerville ("2009 Operating Agreement"). It is undisputed that the lender was wholly unaware of this transaction. Id. at 11. Moreover, Appellant concedes that this transaction was structured to deceive the lender by appearing to be in compliance with the terms of the 2005 Deed of Trust and 2005 Operating Agreement.[3] Id. at 11.

### B. Bankruptcy Proceedings

The Kangs filed a joint Chapter 11 bankruptcy petition on October 19, 2010 in the United States Bankruptcy Court for the Eastern District of Virginia. Id. at 12. In December 2010, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors ("Committee") in the Debtors' jointly-administered bankruptcy cases. Id. On October 18, 2012, the Committee filed a Complaint to Avoid Transfers and to Recover Property and for Related Relief against various defendants, including Appellant. Id.

In January 2013, the Office of the United States Trustee appointed Appellee as the Chapter 11 Trustee for the Debtors' Estates and the bankruptcy court approved the appointment. Id. Appellee joined as co-plaintiff and Appellee and the Committee filed a seven-count Amended Complaint in June 2013.[4] In April 2014, Appellee requested and was granted leave to file and

---

[3] Specifically, Appellant explains: The transaction "was implemented through the conveyance of a 45% interest to Sohn and 4% to Han interest [sic] in Centreville by Equity, coupled with a distribution scheme that allocated profits and equity distributions on a 60%/40% basis. In addition, the Debtors Mik and Min Kang transferred a 51% interest in Formation to Sohn and a 9% interest in Formation to Han." Appellant's Br. at 4.

[4] In April 2013, the United States brought criminal charges against Appellant. See United States v. Yeon Han, No. 1:13-CR-00163 (E.D. Va. 2013); Appellee's Br. at 13. The charges included participation in a scheme to "creat[e] false HUD-1 settlement statements containing inaccurate or non-existent expenses and credits." Id. The Appellee highlights that Appellant admitted during a deposition that she participated in the creation of false HUD-1 settlement statements in connection with the 2009 sale transactions that are the subject of this case. Id. Appellant also admitted to testifying falsely in prior depositions during the Kangs' bankruptcy case regarding falsified HUD-1 statements created after the 2009 sale closing. Id. at 14. On May 15, 2013, Han plead guilty to two counts of conspiracy to commit wire fraud and was sentenced to two concurrent thirty-month terms of imprisonment followed by three years of supervised release, and was ordered to pay over $1 million in restitution. Han, No. 1:13-CR.00163 [Dkt. No. 48].

serve a second amended complaint, and Appellee filed the "Second Amended Complaint to Avoid Transfers and to Recover Property and for Other Relief." Id.

Both parties filed motions for partial summary judgment on May 1, 2014. Appellee's Br. at 14. Pertinent to this appeal, Appellee sought summary judgment under Count VII of the Second Amended Complaint, which requested a declaratory judgment that the 2009 sale transactions were ineffective, null, and void. Id. The Appellee asserted two alternate grounds for relief. The first ground, which the bankruptcy court ultimately accepted, required a predicate finding that the 2005 Operating Agreement was effective and governed the transactions. Id. at 14-15. On June 4 and 5, 2014, the bankruptcy court held hearings on the motions for summary judgment and found that the 2009 transactions violated the 2005 Operating Agreement, and thus were ineffective if the 2005 Operating Agreement governed. Appellant's Br. at 5; Appellee's Br. at 15-18 (elaborating on the bankruptcy court's findings that the 2005 Operating Agreement had been violated).

Focusing on the absence of Kim's signature on the Operating Agreement and the dispute about whether Grand Equity ever signed the appropriate document, the bankruptcy court decided to hold a mini-trial to determine the effectiveness of the 2005 Operating Agreement. Appellee's Br. at 18-19. During the mini-trial, the court heard testimony by Kim and Sohn and examined documentary evidence that demonstrated that the Debtors and Appellant acted as though the 2005 Operating Agreement was effective and properly executed. The bankruptcy court concluded that the 2005 Operating Agreement governed the transaction and was properly executed, regardless of the lost signature page. Id. at 23. In accordance with that finding, the bankruptcy court granted summary judgment on Count VII of the Second Amended Complaint. See J. in Favor of Pls.' Second Am. Compl. [Dkt. No. 293], Nov. 14, 2014.

## II. DISCUSSION

### A. Standard of Review

A district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013. The district court "review[s] the bankruptcy court's legal conclusions de novo and its factual findings for clear error." In re Hartford Sands Inc., 372 F.3d 637, 639 (4th Cir. 2004); see also Fed. R. Bankr. P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous."). "In cases where the issues present mixed questions of law and fact, the Court will apply the clearly erroneous standard to the factual portion of the inquiry and de novo review to the legal conclusions derived from those facts." In re Phinney, 405 B.R. 170, 175 (Bankr. E.D. Va. 2009) (citing Gilbane Bldg. Co. v. Fed. Reserve Bank, 80 F.3d 895, 905 (4th Cir. 1996)).

### B. Effectiveness of the 2005 Operating Agreement for Grand Centreville, L.L.C.

Appellant argues that the bankruptcy court erred in finding that the 2005 Operating Agreement was effective and governed the transaction because it lacked the assent of all members. Specifically, Appellant claims that Mr. Ronnie Kim ("Kim"), an individual designated in the draft of the 2005 Operating Agreement alternately as the "independent member" or the "independent director," did not assent to the Agreement. Appellant's Br. 7. Although Kim concededly held no equity interest in Grand Centreville, Appellant contends that without the assent of this intended member, the Operating Agreement is not legally binding, and therefore does not govern the transaction. Id.

The Virginia Limited Liability Company Act provides that "[a]n operating agreement must initially be agreed to by all of the members." Va. Code. Ann. § 13.1-1023(B)(1). It also provides that a membership interest in a limited liability company is personal property. Id. §

7

13.1-1038. On this question of law, the bankruptcy court found that Kim was never a member, reasoning

> [I]n order to be a member, one has to accept the office. Mr. Kim says he never accepted the office, so he was never a member, notwithstanding that his name appears in the documents. He hadn't seen them, he didn't know it, and the first requisite of acceptance is to be knowledgeable that you are in fact appointed. And he says he never was a member. I think that's conclusive in this instance. So all the members -- he wasn't a member. His participation's not required. There may have been a provision for an independent member, but that was never effectuated.

Summ. J. Hr'g Tr. 40:5-13 [Dkt. No. 289], Oct. 17, 2014. This Court agrees that membership in a limited liability company requires at the very least the putative member's knowledge and assent. See In re DeLuca, 194 B.R. 65, 72 (Bankr. E.D. Va. 1996) (finding that a person became a member of a limited liability company without signing its operating agreement because he consented to membership). Based on his trial and deposition testimony, Kim neither knew of nor assented to his designated office. This Court therefore affirms the bankruptcy court's holding that Kim was never a member of Grand Centreville and consequently his signature was not required for the 2005 Operating Agreement to be effective.

Counsel for the Appellant raised for the first time at oral argument the contention that the members of Grand Centreville could not effectively amend their operating agreement without the affirmative vote of an Independent Director. Even if this Court could properly address claims raised for the first time on appeal, this contention is similarly unfounded. Nowhere in the 2005 Operating Agreement or the 2004 Operating Agreement is there a requirement that the Independent Director must consent to any amendment of the Operating Agreement.[5] "[W]here the operating agreement is silent, resort must be had to the statute." DeLuca, 194 B.R. at 72. The Virginia LLC Act dictates, "[i]f the articles of organization or an operating agreement does not

---

[5] 2005 Operating Agreement art. 18, ¶ 5 (enumerating the actions requiring "the prior written affirmative vote of the Independent Director"); 2004 Operating Agreement.

8

provide for the manner by which an operating agreement may be amended, then all of the members must agree to any amendment of an operating agreement." Va. Code Ann. § 13.1-1023. Because Kim was never a member of Grand Centreville, whose operating agreement does not require that an Independent Director must consent to any amendment, the effectiveness of the 2005 Operating Agreement was not undermined by the absence of Kim's signature.

Furthermore, although Appellant did not raise this issue in her initial brief, Appellee urges this Court to affirm the bankruptcy court's finding that, despite the absence of Grand Equity's signature page, the 2005 Operating Agreement was nevertheless properly executed and effective. The bankruptcy court based this finding of fact on the presence of Grand Formation's executed signature page, the specific reference to the 2005 Operating Agreement in the 2009 Sale Agreement, and other conduct by the parties to the purported 2009 sale that indicated an understanding that the 2005 Operating Agreement was binding. Summ. J. Hr'g Tr. 40:15-41:4 [Dkt. No. 289], Oct. 17, 2014.

Most notable among the evidence in support of such a finding is the overwhelming proof that Mr. Kang possessed signature authority for both Grand Formation *and* Grand Equity—the two entities making up the totality of Grand Centreville's membership. See Appellee's Br. at 20-21 (listing twelve exhibits admitted into evidence at trial indicating Mr. Kang's signature authority for both shell limited liability companies). As the Appellee correctly points out, a finding that Grand Equity neither signed nor assented to the agreement—despite the presence of Mr. Kang's signature on behalf of Grand Formation—would functionally require this Court to hold that Mr. Kang disagreed with himself. See id. at 26. Because the Appellant fails to carry her substantial burden of demonstrating this finding of fact was clearly erroneous, this Court affirms

the finding that the 2005 Operating Agreement was properly executed and therefore effective.[6]

### C. Whether the Transfers of Interest Were Void Ab Initio Because They Violated the 2005 Operating Agreement

Next, Appellant contends that the bankruptcy court erred in finding that the transfers of ownership interests in Grand Centreville to appellant were and remain ineffective, null, and void because the trustee, acting on behalf of the Debtors, is estopped from asserting that the transaction was void. Appellant cites a Fifth Circuit case for the proposition that "[w]hen a trustee prosecutes a right of action derived from the Debtor, the trustee stands in the shoes of the Debtor." Appellant's Br. at 9 (citing Yaquinto v. Segerstrom, 247 F.3d 218 (5th Cir. 2001). In effect, Appellant argues that the trustee cannot seek to avoid the transfer because the Debtors would not have been able to argue that the otherwise-legal transaction in which they partook was void.

Like corporations, Virginia limited liability companies are authorized by statute and require the filing of articles of organization with the State Corporation Commission. See Va. Code Ann. § 13.1-1011. According to the Virginia Limited Liability Act, a limited liability company's powers are confined to those set forth in its operating agreement. See Va. Code Ann. § 13.1-1023(A)(1). Notably, an operating agreement may "provide rights to any person, including a person who is not a party to the operating agreement." Id. Significantly, "[a] limited liability company is bound by its operating agreement whether or not the limited liability company executes the operating agreement." Id.

The bankruptcy court found that operating agreements, like articles of organization and the governing statute dictate "the extent of the authority of the entity." Summ. J. Hr'g Tr. 67:9-10 [Dkt. No. 259], June 9, 2014. The bankruptcy court explained that when a buyer or seller is

---

[6] Because the 2005 Operating Agreement was properly executed, it is not necessary to reach the question of whether the agreement would be binding if unsigned or unwritten.

10

undertaking a significant transaction, due diligence requires each to examine the governing documents of the relevant entity to determine whether that transaction is permitted. Id. at 68:4-14. A transaction that violates an Operating Agreement, which is plainly binding upon the entity, is without legal effect. Therefore, this Court agrees with the bankruptcy court's finding that under the 2005 Operating Agreement, the transfer was ultra vires (the bankruptcy court "read the documents to say that they cannot take any of these actions"). Id. at 70:6-8.

Appellant makes no attempt to argue that the transaction conforms to the restrictions of the 2005 Operating Agreement. Indeed, as the bankruptcy court found, the transaction clearly violates at least four provisions of the 2005 Operating Agreement—all of which were put in place for the benefit of the lender. For example, the 2005 Operating Agreement prohibits "transfer[s] of any direct . . . ownership interest in [Grand Centerville] . . . such that the transferee owns . . . more than a forty-nine percent (49%) interest in [Grand Centreville]" without the prior approval of the lender. 2005 Operating Agreement art. 18; art. 18 ¶ 10. As the Appellant concedes, the 2009 sale purported to transfer "effectively a 60% [interest]" in Grand Centreville. Appellant's Br. at 3. Moreover, all parties agree that the lender neither knew about nor approved this transaction. Appellee's Br. at 11. Accordingly, this transaction, which would have assigned membership interest without the consent of the lender, violated the terms of the 2005 Operating Agreement and was ineffective ab initio. It is unnecessary for this Court to further enumerate the violations of the 2005 Operating Agreement implicated by the purported transaction; one violation of its provisions is enough to nullify all legal effect.[7]

---

[7] Appellant's attempted estoppel argument misses the point. Because this Court finds that under Virginia law, Grand Centreville was bound by the 2005 Operating Agreement and because this transaction clearly contravened the agreement's provisions, it had no legal effect ab initio—as the bankruptcy court put it, the transaction "was and remains ineffective, null, and void." J. Favor Pl. [Dkt. No. 293], Nov. 14, 2014. A question of estoppel might arise if the transaction

### D. Plaintiffs' Standing

Finally, Appellant argues that the Appellee lacked standing to bring the action because the Debtors did not own any part of Grand Centreville in their own names. Appellant's Brief 9. She contends that the bankruptcy court's finding that "[Grand] Equity remains the owner of 99.5% of the membership interests in Centreville" means that in pursuing this action to unwind the transaction between Grand Centreville and Han, the Appellee seeks to enforce rights belonging to corporate entities owned by the Debtors, rather than rights belonging to the Debtors personally. Id. at 10; J. Favor Pl. [Dkt. No. 293], Nov. 14, 2014. This argument is also without merit.

As the Fourth Circuit has explained, "The powers of a bankruptcy trustee . . . arise principally from two sources: (1) the rights of the debtor, 11 U.S.C. § 541, and (2) the rights of creditors of the debtor, 11 U.S.C. § 544. Federal bankruptcy law looks to state law for definition of what interests are rights of the debtor or creditors of the debtor." Steyr-Daimler-Puch of Am. Corp. v. Pappas, 852 F.2d 132, 135 (4th Cir. 1988). "In general, property of the estate includes all legal and equitable interests a debtor has in property as of the commencement of the case. 11 U.S.C. § 541(a)(1)." In re Virginia Broadband, LLC, 498 B.R. 90, 94 (Bankr. W.D. Va. 2013). The Virginia Limited Liability Company Act dictates that the Debtors' beneficial interests in Grand Equity were held in trust by Mr. Kang as trustee in liquidation without any restrictions preventing their distribution. See Two Antique Dealers, LLC v. Barwick, 84 Va. Cir. 496, 498 (2012) ("Assuming that Mr. Morse was the only interest-holder of 2 Antique Dealers and nobody has offered any evidence or argument to show otherwise, then he had the capacity to convey

---

were found voidable, rather than void. Richard L. Deal & Assoc., Inc. v. Commonwealth, 299 S.E.2d 346, 349 (Va. 1983) ("When the contract is once declared ultra vires, the fact that it is executed does not validate it, nor can it be ratified so as to make it the basis of suit or action, nor does the doctrine of estoppel apply.") (internal quotation marks omitted).

those assets whether he identified himself as a trustee in liquidation or not.").

When a Virginia limited liability company is properly constituted and appropriately registered with the State Corporation Commission, "members have no direct interest in the company's property." JTB Enters., L.C. v. D & B Venture, L.C. (In re DeLuca), 194 B.R. 79, 88 (Bankr. E.D. Va. 1996) (citing Va. Code. Ann. § 13.1-1021). As discussed supra, the existence of a limited liability company is cancelled automatically by operation of statute when it fails to pay its annual registration fee within three months of it coming due. Va. Code Ann. § 13.1-1050.2. When a limited liability company is automatically cancelled, the Virginia statute dictates that its property and affairs "shall pass automatically" to its managers, members, or holders of its interests, who, in turn, act as trustees in liquidation. Id. The statute charges trustees in liquidation with winding up the entity and then distributing the remainder of its assets among members or interest holders after all liabilities and obligations are satisfied. Id.

Both Grand Equity and Grand Formation were cancelled as of December 31, 2008 for failure to pay annual registration fees. Appellee's Br. at 8. As the Appellee highlights, "[i]t is undisputed that Grand Equity and Grand Development were shell, pass-through entities that had no creditors or obligations to third parties." Id. at 59. Though counsel for Han disingenuously argued otherwise at oral argument, this point was conceded repeatedly by Sohn's counsel during summary judgment proceedings. See e.g., Summ. J. Hr'g Tr. 128:1-8 [Dkt. No. 259], June 9, 2014 (quoting Sohn's counsel explaining "[Grand Development and Grand Equity] are shell entities, and the representation even in the allegations in the complaint are that they were complete pass-through shell entities . . . we know in this instance that there are no other beneficiaries, because there are no creditors that could be paid."); see also id. at 99:20-24, 110:21-23. Accordingly, with no liabilities or obligations to be satisfied, the property and assets

of these two entities flowed through as a beneficial interest held in trust for the Debtors, who were the sole interest-holders of Grand Development, which itself was the sole interest-holder of Grand Equity. Cf. In re Garrison-Ashburn, L.C., 253 B.R. 700, 708 (Bankr. E.D. Va. 2000) ("Section 541(c) makes plain that no restriction on the transfer of any interest of a debtor—whether it arises from the operative documents themselves or from applicable nonbankruptcy law—prevents an interest from becoming property of the estate.").

Although Appellant anticipates this argument in her brief and again mentions it in her reply brief, she fails to provide any law in support of her assertion that assets held in trust for the sole benefit of the Debtors upon cancellation of the relevant limited liability companies do not create an interest that supports standing. Appellant's Brief at 10; Appellant's Reply at 10-11.

Because Grand Equity had no debts or obligations to satisfy, the Debtors had a beneficial interest in Grand Equity's full ownership interest of Grand Centreville at the time this action was filed. Accordingly, the trustee has "such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth v. Seldin, 422 U.S. 490, 498-99 (1975). Grand Centreville's subsequent plan of reorganization merely illustrates and confirms the direct interest held by the bankrupt estate; it does not create it. As such, this final contention is also without merit and the Appellee has proper standing.

III. CONCLUSION

For the reasons stated above, the bankruptcy court's Order granting summary judgment will be affirmed by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 30 day of September, 2015.

Alexandria, Virginia

/s/ 
Leonie M. Brinkema
United States District Judge